Jesse Coy **KIMBROUGH**, Plaintiff-Appellant,

v.

Dr. George J. **BETO**, Director, Texas Department of Corrections, Defendant-Appellee.

No. 26595.

United States Court of Appeals
Fifth Circuit.

May 26, 1969.

Jesse Coy Kimbrough, pro se.

Crawford C. Martin, Atty. Gen. of Texas, Allo B. Crow, Jr., Asst. Atty. Gen., Austin, Tex., for defendant-appellee.

Before BELL, AINSWORTH and GODBOLD, Circuit Judges.

PER CURIAM:

It is appropriate to dispose of this pro se case summarily, pursuant to this Court's local Rule 9(c) (2), appellant having failed to file a brief within the time fixed by Rule 31, Federal Rules of Appellate Procedure.

In this habeas corpus proceeding involving a Texas state conviction on a plea of guilty, the Federal District Judge below conducted a thorough and complete evidentiary hearing and denied the petition. The testimony of the principal actors in the case had been received in evidence and fully considered by the Trial Judge. Petitioner was represented at the habeas hearing by experienced court-appointed counsel with more than twenty years' experience. In a comprehensive and well-reasoned opinion (unpublished) the District Court rejected all of the several contentions urged by petitioner as grounds for setting aside his convictions. We adopt the findings and conclusions of the Trial Court and attach his memorandum opinion as an appendix to this opinion.

One of petitioner's contentions relates to the voluntariness of his guilty plea which leads us to expand our comments in regard to this issue as follows: The record fully discloses the facts and circumstances pertinent to the entering of the plea of guilty—a plea which was entered more than four years prior to the hearing of the present petition. The evidence revolved around the contention of petitioner that he pled guilty only because he was threatened by the District Attorney that if he did not do so he would be reindicted and tried as an habitual criminal under Texas state law. It is conceded that there were prior convictions to support such an indictment.

The District Judge made credibility choices—which he had a right as trier of the facts to do—and rejected the testimony of petitioner, his father, and his attorney. The Trial Judge found that the testimony of petitioner's lawyer had been dimmed with the passage of time, and that he either misunderstood the District Attorney's statement relative to the threat of indictment of petitioner as an habitual criminal or had forgotten exactly what was said when he testified at the present hearing. The District Judge held that it was plain from the testimony of petitioner's counsel that he urged petitioner to plead guilty based on his own independent judgment of the merits and practicalities of the case, on the fact that petitioner was guilty, that the State could prove it, and that it was in petitioner's best interest to plead guilty in order to obtain the promised recommendation of a fifteen-year sentence—that all of this was without regard to anything the District Attorney stated or did on the morning the plea was entered. Petitioner, in the presence and with the assistance of his defense counsel, entered a plea of guilty in the Texas State Court after being carefully examined by the State Court Judge, in approved fashion, as to whether his plea was being freely and voluntarily made.

The Federal District Judge held that he was "convinced that the district attorney was telling the truth" about the matter and "that the district attorney did not state that he was going to have petitioner re-indicted and tried as an habitual criminal."

It is true that the Court felt that even if petitioner had been able to prove that the District Attorney did threaten to reindict him as an habitual criminal it would have been unavailing since this would not have been "illegitimate action," since there were prior convictions to support such an indictment. But it is abundantly clear that the District Judge's decision was not based on this concept, but upon findings of credibility as between the witnesses who testified.

The Court held "that it was the legitimate urging of defense counsel and the petitioner's own realization that he was guilty and the State had the proof, and not any conduct on the part of the district attorney on the morning in question, which brought about the pleas of guilty."

A reading of the District Judge's memorandum opinion shows that he believed the testimony of the State District Attorney, but did not accept as true the testimony of petitioner or of his witnesses on the issue of the threat to reindict petitioner as an habitual criminal in order to induce his plea of guilty.

"It is well settled that in order for a reviewing court to set aside findings of fact by a trial court sitting without a jury, it must be clearly demonstrated that such findings are without adequate evidentiary support in the record, or were induced by an erroneous view of the law, and the burden of showing that the findings are clearly erroneous is on the one attacking them. *The findings of a district court are not, therefore, lightly to be set aside, for the Court of Appeals is not a trier of facts, and does not substitute its own judgment for that of the trial court.*"

Chaney v. City of Galveston, 5 Cir., 1966, 368 F.2d 774, 776. (Emphasis added.) We should not attempt, as an appellate court, to decide where the truth lies among the several witnesses, without hearing or seeing them, and in derogation of the right and duty of the Trial Court to make credibility choices.

Affirmed.

### APPENDIX

### MEMORANDUM OPINION

A full evidentiary hearing has been held on the petitioner's application for writ of habeas corpus, with petitioner and his court appointed counsel present in person and participating. His lawyer was able and had had over twenty years experience in the practice. Adequate time was given for preparation,

and petitioner was well represented in this hearing.

On May 27, 1963, the petitioner was convicted in Causes Nos. 13063, 13064, and 13065, all styled the State of Texas vs. Jesse Coy Kimbrough, in the District Court of Stephens County, Texas, of the three offenses of burglary, illegal possession of narcotic drugs (morphine, Demerol and Dolophine) and illegal possession of paraphernalia for purpose of injecting narcotic drugs. The convictions were upon negotiated pleas which met the standards laid down in Cooper v. Holman, 5 Cir., 356 F.2d 82 (1966), and Brown v. Beto, 5 Cir., 377 F.2d 950 (1967). The petitioner's criminal record showed that he had lived a life of crime with convictions for serious offenses, including robbery, smuggling of heroin, and burglary; but he was let off with a total sentence of fifteen years, arrived at by twelve years on the burglary case and fifteen years on each of the narcotics cases, all to run concurrently. The penalty for burglary in Texas was two to twelve years, and, for each of the offenses under the narcotics statute, was two years to life. Vernon's Ann.Texas Penal Code, Articles 1397 and 725 b, Sec. 23, respectively. The minimum sentence under the narcotics statute for a person who had a prior narcotics conviction was ten years.

The petitioner prepared his own application with the help of fellow convict professional "writ writers", and his attorney did not deem it necessary to amend the application. With allowances usually made under these circumstances, the Court has liberally construed the application and all papers filed by petitioner in connection therewith and has heard evidence on all grounds without regard to formalities. When his application and supporting papers are so construed, the grounds urged by petitioner for setting aside his three convictions are:

1. The search of his clothing and his pickup truck was illegal.

2. The hearing on the issue of his sanity held in advance of the day of his trial was invalid because his psychiatric testimony was not rebutted by opinion testimony of like character.

3. He was under the influence of narcotics at the time he pleaded guilty.

4. His pleas of guilty were involuntary.

The petitioner is a chronic "writ writer". His testimony indicates that he has spent most of his spare time in the "writ room" since he has been in the penitentiary on this occasion. He says he has read all the recent Supreme Court decisions in criminal cases he could get his hands on. He filed four applications for writ of habeas corpus in the state court and one in the federal court before this proceeding was instituted in the Abilene Division of this Court. Some of the same grounds have been repeated over and over, even after previous applications containing them had been rejected. He has also filed one in the Fort Worth Division of this Court after the evidence was heard in this matter in Abilene, giving him a total of seven applications. In view of the petitioner's strong literary inclinations, this opinion will be more lengthy than it probably ought to be, with the hope that time will be saved in the long run by slowing down petitioner and his convict ghost writers in their repetitious urging of meritless grounds through variations in shading. Each point here urged will be discussed, then, not only from the standpoint of whether the facts support petitioner's claims, but also of whether the petitioner would have any legal standing even if his claims were factually supported.

The petitioner lived in Eastland, Texas, which is about thirty-five miles from Breckenridge, Texas. Two nighttime drug store burglaries, each involving a theft of a considerable quantity of narcotic drugs occurred in Breckenridge within a few days of each other in October, 1962. After the last burglary, the petitioner, operating a pickup truck at a high rate of speed, ran head-on into a truck on the outskirts of Breckenridge as he was leaving the city. He was knocked unconscious, and was taken to

a hospital where he remained unconscious for some days. Officers called to investigate the wreck found a substantial quantity of morphine and other narcotic drugs in the cab of the truck, and some of such drugs and the paraphernalia for injecting them in petitioner's clothes. The petitioner was the only occupant of the pickup. The narcotics were in pill form and were in the type of bottles used in drug stores for keeping such drugs in bulk. None of the bottles was the type of container used for sale of narcotics under prescription, and none of them bore a prescription label. A substantial number of the bottles had labels bearing the name of the contents and the handwritten initials and cost symbols marked on them by the owner of the burglarized drug stores. The initials and cost symbols put the owner in position where he could identify such bottles. By such identifications, it was known that there were some narcotic drugs in the cab of the pickup at the time of the wreck which came from each of the two drug store burglaries in Breckenridge above mentioned. There were other bottles which bore no labels. The total of the narcotics bottles was enough to fill a shoe box.

Petitioner's father employed Charles Tessmer of Dallas, one of Texas' leading lawyers in defense of criminal cases, to represent petitioner. Mr. Caraway, an associate in his office was actually assigned to the case, but Mr. Tessmer remained in continual and close contact with it. He consulted and advised with Mr. Caraway about all defense strategy, and Mr. Caraway zealously and capably represented petitioner. A psychiatrist in Dallas, selected by Mr. Tessmer, was employed to examine petitioner, and a separate hearing in advance of the trial on the merits was held on the issue of the petitioner's sanity in accordance with the provisions of Article 932b, Vernon's Ann. Code of Criminal Procedure of Texas, the pertinent statute in force at the time. The procedure under that statute is summarized in the following quotation from 16 Tex.Jur.2d, p. 212:

"Where the question of insanity is raised and the issue tried alone before the main charge, or tried in connection with the main charge, the jury is required to state whether the defendant was sane or insane at the time the offense was allegedly committed and whether he is sane or insane at the time of trial. If the jury finds the defendant insane at the time of the offense, he is to be acquitted. If the jury finds the defendant to be insane at the time of trial the court must enter an order committing the defendant to a mental hospital. If the defendant is acquitted, the court must so state in the commitment order."

In the sanity hearing held on April 15, 1963, the jury found against petitioner on both issues.

While the statute permitted an accused to urge the defense of insanity again on the trial on the merits, such a course usually availed nothing unless he could come up with some additional persuasive evidence on the issue. It therefore became important to decide whether to contest the cases or to attempt to negotiate a plea of guilty with a recommendation from the district attorney of a penalty lighter than the one which could be reasonably expected at the hands of a jury. After considerable discussion among the petitioner, Mr. Tessmer and Mr. Caraway, it was unanimously agreed that the latter was by far the better course. The lawyers told petitioner they could not win his case. That petitioner himself felt the same way is shown by his testimony in this hearing that, " * * * I told Mr. Caraway there was a shoe box full of narcotics in the pickup (sic), and I couldn't possibly beat the case."

Petitioner's counsel contacted the district attorney and sought to get him to recommend a lenient sentence for petitioner in the event he pleaded guilty. After considerable negotiation, the district attorney agreed to recommend 15 years in each of the narcotics cases and 12 years in the burglary case, all to run concurrently, thereby giving the peti-

tioner a maximum of 15 years. Mr. Tessmer and Mr. Caraway thought that it was a fair proposal and advised petitioner to plead guilty. They felt that, in view of the facts of the cases, there was a strong danger that petitioner would get more than the minimum sentence in each case,[1] and that the court would run them consecutively on account of petitioner's record. The petitioner agreed, and all of the attorneys in the case considered that the matter was definitely settled.

The petitioner did plead guilty when he was arraigned in the three cases on May 27, 1963. The district attorney made the agreed recommendation, and the court followed it and assessed the penalty accordingly. The petitioner's claims and the circumstances connected with that proceeding will be discussed under the heading of "Voluntariness of the Pleas."

### Search and Seizure

■ Without agreeing that petitioner can properly attack the validity of the search of the pickup and of his clothes in this proceeding under the circumstances of this case, the Court finds that he has failed to establish their illegality. From what evidence there is in this record, the searches were reasonable, rather than unreasonable. The officers making the search were called to the scene of a wreck involving a pickup, the only occupant of which was unconscious. It was their duty to check the contents of the pickup and his clothing to determine his identity and to safeguard his possessions. The search was by state officers and was therefore governed by state law. Patella v. State, Tex.Cr.App., 367 S.W.2d 340 (1963), held that state officers were justified in making a search of a car and its driver where he was noticed slumped over the steering wheel in an unconscious condition. A conviction for possession of amphetamine tablets found as a result of such investigation was upheld.

### Validity of Adjudication in Sanity Hearing

■ The petitioner claims that the judgment in his sanity hearing is void because the State did not rebut the opinion evidence of his psychiatrist with like opinion evidence. He claims specifically that the doctor offered by the State was only a general practitioner, and that his testimony was therefore insufficient to overcome that of the psychiatrist offered by the defense.

The facts do not support this claim because the expert witness used by the State was actually a psychiatrist. Mr. Neal, the prosecuting attorney at the time; testified on this hearing: " * * * And I had a psychiatrist from Sheppard Air Force Base in Wichita Falls; I don't recall his name, who was in charge of the Psychiatric Section or ward of the hospital at Sheppard Air Force Base to come down and examine the defendant. And then I placed him on the stand and he testified the man was sane  *  *  * " The Court so finds.

---

1. It has not been safe to speculate on the minimum sentence at the hands of juries in dope cases in Texas. That state court juries have not been sympathetic towards those involved in the marihuana or dope racket is evidenced by the fact that it is hard to find a recorded case where the minimum penalty, or any penalty near the minimum, was assessed by a jury for a violation of the state statutes prohibiting possession of marihuana and narcotic drugs. Penalties like those in the following cases are more frequent:

    *90 years to life:* Route v. State, 168 Tex.Cr.R. 388, 327 S.W.2d 761 (1959); Trevino v. State, Tex.Cr.App., 380 S.W. 2d 118 (1963); Dumont v. State, Tex.

    Cr.App., 398 S.W.2d 129 (1965); Clifton v. State, Tex.Cr.App., 399 S.W.2d 353 (1966).

    *25 years:* Perez v. State, 172 Cex.Cr. R. 492, 358 S.W.2d 381 (1962); Martinez v. State, Tex.Cr.App., 373 S.W.2d 246 (1963).

    *20 years:* Bailey v. State, 172 Tex. Cr.R. 260, 356 S.W.2d 688 (1962).

    *15 years:* Phillips v. State, 168 Tex. Cr.R. 463, 328 S.W.2d 873 (1959); Kirby v. State, Tex.Cr.App. 406 S.W.2d 443 (1966).

    All the above penalties were assessed in cases where no prior narcotics convictions appeared.

Even if this claim were factually supported, it would still lack merit because:

1. This is not the type of question which can be raised on collateral attack. It is neither jurisdictional, constitutional nor fundamental in nature.

2. The question was waived by the pleas of guilty entered in the proceeding where petitioner was represented by competent, employed counsel. A plea of guilty, voluntarily and understandingly made, "is conclusive as to defendant's guilt, admits all the facts charged and waives all non-jurisdictional defects in the prior proceedings." White v. Beto, 5 Cir., 367 F.2d 557, 558 (1966). See also Busby v. Holman, 5 Cir., 356 F.2d 75 (1966); Law v. Beto, 5 Cir., 370 F.2d 369 (1966); Brown v. Beto, 5 Cir., 377 F.2d 950 (1967); Henderson v. United States, 5 Cir., 395 F.2d 209 (1968).

3. The State was not limited to psychiatric testimony in rebutting psychiatric opinion evidence offered by the defense. Mims v. United States, 5 Cir., 375 F.2d 135 (1967). In that case, the accused offered the testimony of two psychiatrists, and the government produced no expert witnesses. It was held that the testimony of the government's non-expert witnesses was sufficient to support a finding of sanity.

### Voluntariness of Pleas

█ The petitioner claims that his pleas of guilty were not voluntarily and understandingly entered because:

(1) He was under the influence of narcotics at the time.

(2) The district attorney told him that:

a. He was going to ask the court to require that he furnish bail bonds with sureties who could qualify for the amount of the bonds.

b. He was going to have him re-indicted as an habitual criminal.

The first claim about being under the influence of narcotics depends almost entirely on petitioner's testimony, and the one about the threat of re-indictment depends to a material extent upon it. The Court does not regard him as a credible witness. That conclusion would have been arrived at from his demeanor alone. In addition, his record of felony convictions showed that he was just a rank hoodlum. It was plain that he had no integrity or sense of social responsibility, that he was ruthless and would be willing to swear to anything, no matter how false, to get out of the penitentiary.

The Court finds that petitioner was not under the influence of narcotics at the time he entered his pleas of guilty. He has not proved to the Court's satisfaction by a preponderance of the evidence that he had even taken narcotics at a time close enough to the arraignment that he could possibly have been influenced thereby.

The petitioner is the only witness who testified either that he had taken narcotics on the early morning of the day in question, as claimed by him, or that he was under the influence of them at the critical time. His father was around him and talked to him for some time off and on all during the morning he pleaded guilty. Petitioner said he took a shot of morphine at his father's home in Eastland before they left for the courthouse in Breckenridge. While it was to be expected that he would take the injection in private, if he took one, his father never testified to any conduct on the part of petitioner before they left the house, while they were in the car on the way to Breckenridge, or after they got to the courthouse, that led him to believe or even suspect either that petitioner had had a shot or that he was under the influence of it. In addition, the petitioner, in his own testimony on this hearing, gave a detailed account of what he claimed happened at the courthouse on the morning in question. The effect of that testimony was that he knew and comprehended what was going on, and that he remembered every bit of it. That was entirely inconsistent with his claim that he was under the influence of dope to the extent that his pleas should be vitiated.

For the purpose of foreclosing future applications on this point, the Court points out that it has recently been held that the fact that a narcotic addict was under the influence of dope at the time he entered a plea of guilty did not render his plea invalid where he was "capable of understanding the proceedings against him and could enter an intelligent plea." Davis v. State, 10 Cir., 392 F.2d 291 (1968). The petitioner's condition at the time he pleaded guilty certainly more than met those standards even if his claim that he had had a shot and was feeling it to some extent were factually supported.

In regard to the other grounds for claiming the pleas were invalid, the Court finds (1) that the district attorney did not state that he was going to have petitioner reindicted and tried as an habitual criminal, and (2) that the district attorney did tell petitioner's counsel that he was going to ask the court to set aside the petitioner's bail bonds and require new bonds with adequate sureties. The setting in which the last statement was made appears from the brief summary of the circumstances that follows.

After petitioner had told his attorneys that he was going to plead guilty, they so informed the district attorney and petitioner's cases were set for arraignment for May 27, 1963. Several unrelated cases involving other persons were also set for the same purpose for that day. When the parties reached the courthouse on the morning of May 27th, the petitioner's father for some unknown reason, decided that the State did not have sufficient evidence to convict, and advised the petitioner not to plead guilty. Petitioner then informed his counsel that he had changed his mind about pleading guilty, and counsel conveyed the information to the district attorney. The arraignments in the other cases took some time. During intervals between those arraignments the district attorney and defense counsel had several short conversations in the courtroom. Petitioner and his father remained outside the courtroom in the hall, and his lawyer spent a good part of his time out there telling him that they could not beat the cases and that fifteen years was less than they could expect if the penalties were fixed by juries.

The petitioner and his father claim that the district attorney told petitioner and his counsel in the hall that if petitioner persisted in not going through with the pleas, he would have petitioner re-indicted as an habitual criminal the next day. That obviously could not have happened because there was no grand jury in session at the time. Petitioner's lawyer also says that his recollection is that the district attorney told him that petitioner would be re-indicted as an habitual criminal. The district attorney denied that he ever told anyone that the petitioner would be so re-indicted if he did not plead guilty. He said that he never went any stronger than to say to defense counsel that he probably should have had petitioner indicted as an habitual criminal in the beginning.[2] The

2. "Q All right, but you did tell, or did you tell the defendant's attorney in his presence, that you should have indicted him, or would reindict him as an habitual?

"THE COURT: That involves two questions. Which do you want an answer to, whether he should have indicted him as an habitual or would?

"Q Let's ask that one first, that you should have indicted him as an habitual?

"A I think I told Mr. Caraway several times in our conversations, either on the telephone or when he was in Breckenridge on motions and so forth, that I probably should have indicted him as an ha-

bitual. But in view of the penalty that this particular crime carried, I didn't see the necessity of doing it.

"Q Did you ever say that in the presence of the defendant?

"A I don't recall if I did.

"Q Either in the courtroom or perhaps in the hallway just passing? You don't ever recall in the presence of the defendant telling him that you were going to have the bonds revoked and if he didn't plead guilty, that you were going to have him reindicted the next day as an habitual?

"A I couldn't have had him reindicted the next day.

Court is convinced that the district attorney was telling the truth about it. As has already been stated, the petitioner was not a credible witness. His poor father was typical of the parent of a wayward son so often seen in connection with criminal trials. He could not see how his son could be in the wrong, no matter what he did. He and his wife had gone broke trying to keep the petitioner out of the penitentiary, and petitioner showed his appreciation by continuing his lawless ways. The poor fellow's interest in the case was so overwhelming that he believed that anything his son related to get out of the penitentiary must have happened. The most charitable way to evaluate petitioner's lawyer's testimony would be to say that his recollection had been dimmed with the passage of more than four years, and that one of two things had happened to him. He either misunderstood the district attorney's statement that he probably should have had the petitioner indicted as an habitual criminal, or he had forgotten exactly what was said when he testified on this hearing. To take the only other view would produce a situation where it would be necessary to decide whether the lawyer was trying to help put over a fraud on the court that took the pleas or on this Court. Both petitioner and his lawyer admit that petitioner told the state court judge that his pleas of guilty were not induced by threats or promises. The judgments of conviction in each one of the cases also show that. If those statements by petitioner were not true, it was the lawyer's duty to speak up and say so. If he did otherwise, he was participating in the perpetration of a fraud on that court. If he would do it there, he would do it again here. His testimony on this trial was not convincing, but the Court prefers to dispose of it on the basis that he misunderstood the statement when it was made to him.

The district attorney says that he did, as claimed by petitioner, tell defense counsel that he was going to ask the court to require new bail bonds or proof of the adequacy of the surety on the existing bonds. The bonds were not offered in evidence in this case; but it appears from the oral testimony that there was a $5,000.00 bond in each case, and that petitioner's father was the only surety on each of the bonds. When the district attorney reached the courthouse on the morning of May 27th, he went to the Sheriff's office to look over the F.B.I. fingerprint reports and the bonds of the defendants who were going to be arraigned that day. He discovered that petitioner's bonds, with only one individual surety, had been accepted by the Sheriff of Eastland County without any proof of the adequacy of the surety. He called the matter to the attention of the Sheriff of Stephens County, where the offenses were committed and the arraignments were to be held, and told him at that time that if the case was not disposed of that day, new bonds would have to be had unless the surety could qualify under the statute. Later on that morning, he did present the matter to the court by motion. Neither petitioner nor his counsel offered any objection when the court asked if they had anything to say; and the court directed that new bonds be required.

"Q I realize that, but did you ever say it? That is the point. Did you ever say it, to your knowledge?

"A No, sir.

"Q In his presence?

"A No, sir.

"THE COURT: Did you ever say it at any time to him or to Mr. Caraway, that if he didn't plead guilty, you would have him reindicted and reindicted as an habitual criminal?

"A My statement to Mr. Caraway was that if he decided not to plead guilty that —as he had agreed upon—that I was certainly going to ask the court to set aside his bonds and—

"THE COURT:—What I am getting at—

"A —And that is the only conversation I had.

"THE COURT: Did you ever threaten him with reindictment if he did not plead guilty?

"A No, sir."

The district attorney was not only acting within his rights, but was also performing his duty when he called the bond situation to the attention of the court. Article 275a, Vernon's Ann.C.C.P.,[3] made provision for the requirement by the court of a new bond where it developed during the pendency of a criminal action that the sureties were not adequate. "It is not only the right, but it is also the duty, of an officer who has taken an insufficient or illegal bond to require one which is legal and sufficient." 8 C.J.S. Bail § 64, p. 190, citing United States v. Flynn, 2 Cir., 190 F.2d 672 (1951). Article 277, Vernon's Ann., C.C.P.,[4] provided that the officer taking the bond should require evidence of the sufficiency of the sureties, and in case of only one surety, evidence of his worth of at least double the amount of the bond, exclusive of exemptions, encumbrances and indebtedness. The petitioner's father was the only surety on the bond, and there was no evidence whatever, by his affidavit or otherwise, as to his financial worth. The evidence on this hearing shows that his signature on the bond was worthless. He had conveyed what real property he owned to the attorneys as security for his fee. Caraway said that it was all he could do to get up the money required to pay the psychiatrist. The petitioner's record certainly justified apprehension about whether he would be present for the trial. On one occasion, he has escaped in Big Spring, Texas, just after he had been sentenced to serve a term for burglary, and was later apprehended in El Paso. At a later date, he had escaped after receiving a sentence in Fort Worth for robbery. In that connection, petitioner testified on this hearing: "When I pled guilty at Fort Worth, I escaped out of jail and got caught at New Orleans burglarizing a jewelry store." His fingerprint record states that he was armed with a dangerous weapon when he was caught in the jewelry store. With this background of light-footedness and of three separate trips to penitentiaries for such serious offenses as smuggling heroin, robbery and burglary, the district attorney and the court were justified in wanting an adequate surety on his bonds. It is pointed out in this connection that there was no effort to deny bail, and that petitioner and his counsel understood that even petitioner's father would be accepted if evidence were furnished that he met the statutory requirements.

The district attorney's statement that he was going to require new bail bonds and the action taken in connection therewith are no basis for invalidating the petitioner's pleas of guilty. The courts have uniformly followed the rule announced in Kent v. United States, 1 Cir., 272 F.2d 795, 799 (1959), that in

3. All references to statutes governing bail bond procedure are to those contained in Vernon's Ann.Code of Criminal Procedure, the code in effect at the time of petitioner's convictions here involved. The Revised Code of Criminal Procedure was passed several years later. However, such amendments as it made in the bail bond procedure would not change the picture in this case.

Vernon's Ann.C.C.P., Article 275a, provided:

"[W]henever, during the course of the action, the judge or magistrate in whose court such action is pending finds that the bond or recognizance is defective, excessive or insufficient in amount, or that the sureties are not acceptable, or for any other good and sufficient cause, such judge or magistrate may, either in termtime or in vacation, order the accused to be rearrested, and required the accused to give another bond or enter into another recognizance, in such amount as the judge or magistrate may deem proper."

4. Vernon's Ann. C.C.P., Article 277, provided:

"Every court, judge, magistrate or other officer taking a bail shall require evidence of the sufficiency of the security offered; but, in every case, one surety shall be sufficient, if it be made to appear that such surety is worth at least double the amount of the sum for which he is bound, exclusive of all property exempted by law from execution, and of debts or other incumbrances; and that he is a resident of this State, and has property therein liable to execution worth the sum for which he is bound."

order to set aside a plea of guilty on account of the conduct of the prosecuting attorney, "Petitioner must show that he was subjected to threats or promises of illegitimate action." In Lattin v. Cox, 10 Cir., 355 F.2d 397 (1966), the prosecutor told defense counsel that he was contemplating trying defendant as an habitual criminal unless he pleaded guilty to certain charges. In refusing to set aside the pleas so entered, the Circuit Court said at p. 400: "The District Attorney for the State of New Mexico did not threaten Lattin with any action that was illegitimate or any charges that were unrealistic." In the recent case of Stepp v. Beto, 5 Cir. (No. 24816 May 31, 1968),[5] the Court of Appeals for the Fifth Circuit said: " * * * Assuming arguendo that these promises were actually made, unless the appellant can show that illegitimate action was contemplated, or that he was in some manner deceived, the pleas must stand * * * Kent v. United States, 272 F. 2d 795 (1 Cir., 1959)." See also Cortez v. United States, 9 Cir., 337 F.2d 699 (1964).

The same rule would apply even if petitioner had been able to prove that the district attorney did threaten to re-indict him as an habitual criminal. It is conceded that he had the prior convictions necessary to support such an indictment.

The Court finds, however, that it was the legitimate urging of defense counsel and the petitioner's own realization that he was guilty and the State had the proof, and not any conduct on the part of the district attorney on the morning in question, which brought about the pleas of guilty. The petitioner just finally decided to let his attorney rather than his father be his lawyer in the cases. The validity of such pleas must be determined from the totality of events and circumstances which preceded their entry, and from the background and experience of the accused. United States v. Kniess, 7 Cir., 264 F.2d 353 (1959); Adkins v. United States, 8 Cir., 298 F.2d 842 (1962); United States v. Colson, D.C.N.Y., 230 F.Supp. 953 (1964); Del Piano v. United States, D.C.Pa., 240 F.Supp. 687 (1965); Earley v. United States, D.C.Cal., 263 F.Supp. 522 (1966). It is conceded that on the morning of May 27th petitioner's counsel strongly urged him to go ahead and enter the pleas of guilty. His urging had been just as strong when petitioner was in his office with Mr. Tessmer present on the occasion when he told them he was going to plead guilty and take the fifteen years. It is plain from the testimony of petitioner's counsel that this urging to plead guilty represented his own independent judgment, based solely on the merits and practicalities of the case—on the facts that the petitioner was guilty, that the state could prove it on him, and that it was in his best interest to plead guilty on the basis of the promised recommendation. The large amount of narcotics found in the pickup could easily have led the jury to believe that petitioner was involved in drug traffic, and it would not have been out of the ordinary for them to assess a life sentence. That feeling and that conduct was all without regard to anything the district attorney said or did on the morning in question. There is nothing wrong in the defense counsel's advising a guilty client of the possible consequences of a futile contest of his case. Rogers v. Wainwright, 5 Cir., 394 F.2d 492 (1968); Lattin v. Cox, supra. Petitioner, himself, was satisfied with the situation until his mother visited him in the penitentiary two years after he had been sentenced and gave him the erroneous information that the only narcotics found on the occasion in question were those on his person, which he concluded could not be traced back to the burglaries. She convinced petitioner that he had "dreamed" that the other narcotics were in the pickup. Up to

5. "The District Judge refers to language in our opinion in Stepp v. Beto, supra, which was later withdrawn and as finally published on July 11, 1968, does not contain the quoted matter. See 398 F.2d 814.

that time, petitioner had never raised any question about the voluntariness of his pleas. To paraphrase the language of the Court of Appeals for the Ninth Circuit in Cortez v. United States, supra, 337 F.2d, at 702, this Court believes the statement made by petitioner to the state court at the time of his arraignment that his pleas were not induced by any threats, and that he was pleading guilty voluntarily, just because he was guilty, and for no other reason.

The pleas of guilty were voluntarily and understandingly entered.

### Conclusion

An order will be entered denying the application for writ of habeas corpus.

This opinion will serve as findings of fact and conclusions of law.

Signed this 24th day of June, 1968.

/s/ LEO BREWSTER
JUDGE

GODBOLD, Circuit Judge (dissenting):

With deference to my colleagues I must dissent from their conclusion on the voluntariness of the guilty plea. In this particular instance I am unable to accede to the one-two combination of first declining to disturb the factual determinations because of the plainly erroneous rule and the deference given to credibility findings of the trial judge, and then on the basis of that conclusion declining to review an error of law.

In the narcotics case appellant's father employed to defend him a Dallas attorney, described by the habeas judge as "one of Texas' leading lawyers in defense of criminal cases." This senior attorney associated in the defense Robert Caraway, a younger attorney who shared offices with him and whose criminal experience was limited. The senior attorney remained in close contact with the case and consulted and advised with Caraway about it. The district attorney proposed a negotiated plea of guilty with concurrent sentences of fifteen, fifteen and ten years. The proposal was discussed among appellant and both defense attorneys. The attorneys thought the proposal fair and advised appellant to plead guilty, and he agreed to do so. The agreement was communicated to the district attorney.

Appellant's case was set for trial on a nonjury day, at which time his agreed plea was to be entered. Several unrelated cases were set the same day for the same purpose. Because of the agreement the district attorney had no witnesses present. When appellant reached the courthouse his father, believing that the state did not have enough evidence to convict him, advised him not to plead guilty. The senior attorney was not present. Appellant told Caraway that he had changed his mind about pleading guilty. Caraway conveyed the information to the district attorney. At intervals during the calling of the docket the district attorney and the defense counsel had several conversations.

Appellant, his father, and Caraway all say that the district attorney stated that if appellant did not go through with the bargain to take a plea he would have appellant reindicted as an habitual criminal. Appellant's past record was such that he was subject to the Texas habitual statute under which, if convicted, a life sentence was mandatory. Under the charges against appellant he was subject to two to twelve years on the burglary charge and five years to life on each narcotics charge,[1] but the possible life sentences were not mandatory.

There followed discussions among appellant and his father and Caraway, and between Caraway and the district attorney. Caraway describes the matter in general as "quite a heated thing going on." Appellant finally agreed again to the bargained plea and to the sentences previously agreed upon. The plea was entered, and appellant sentenced, that same day. In open court, with Caraway present, appellant was asked whether

---

1. Tex.Pen.Code Ann. art. 1397 (1959) and art. 725b § 23(1). (Supp.1968).

anyone threatened him or promised him anything to induce a plea, and he answered in the negative.

There is no doubt that the subject of reindicting appellant as an habitual criminal was discussed. The habeas judge found:

> The district attorney denied that he ever told anyone that the petitioner would be so re-indicted if he did not plead guilty. He said that he never went any stronger than to say to defense counsel that he probably should have had petitioner indicted as an habitual criminal in the beginning.

The testimony of the district attorney was not quite that crystal clear. In fact, it was carefully qualified, which is understandable so many years after the event.[2]

The unequivocal testimony of Caraway was that the district attorney did state to him the threat to reindict appellant as an habitual criminal and that after receiving the threat he negotiated with appellant to get him to plead as previously agreed. His testimony was rejected as not credible on the ground he had forgotten what happened, or misunderstood what the prosecutor had said, and had stood silent in court at sentencing when appellant told the court there had been neither threats nor promises. (Also *see* note 4, *infra.*) Caraway testified that he thought appellant should go ahead with the plea of guilty, that appellant decided he did not want to do so, and that from hindsight he (Caraway)

erred in "acquiescing" in and not objecting to the threat of reindictment, that in his view appellant was forced to enter the plea and he "probably helped to coerce him."

Turning to the question of law, the district court held that even if a threat to reindict was made this did not vitiate the plea of guilty because it was not a threat of illegitimate action, citing, Lattin v. Cox, 355 F.2d 397 (10th Cir. 1966); Kent v. United States, 272 F.2d 795 (1st Cir. 1959). The principle is erroneously applied in the case *sub judice.* The matter is not one of formulas or of magic words such as "illegitimate action" (presumably construed to mean a violation of criminal law). There must be analysis of the totality of circumstances to ascertain whether the appellant's guilty plea, when entered, was the voluntary choice of a free and unrestrained will, Johnson v. Wilson, 371 F.2d 911 (9th Cir. 1967).

In every case where the defendant is considering whether to plead guilty counsel has not only the right but the obligation to advise him of the possible consequences of a trial and of other consequences, if there be any, of a not guilty plea. Cooper v. Holman, 356 F.2d 82 (5th Cir. 1966). There should be advice by the attorney "of the full measure of appellant's potential criminal responsibility", which includes the possibility of the prosecution bringing additional charges. Lattin v. Cox, supra, 355 F.2d at 400; Allen v. Rodriguez, 372 F.2d 116

---

2. First, the prosecutor testified:

> I think I told Mr. Caraway *probably I should have indicted him as an habitual,* but after studying the thing, that the maximum was life anyhow.

Then later:

> I think I told Mr. Caraway several times in our conversations, either on the telephone or when he was in Breckenridge on motions and so forth, that *I probably should have indicted him as an habitual.* But in view of the penalty that this particular crime carried, I didn't see the necessity of doing it.

And later:

> Your Honor, as I said, *I do not recall* threatening this man or through

his attorney in any way with reindictment as an habitual. *I do recall telling his attorney several times that I should have indicted him as an habitual, probably.*

He was pressed by the court to express his best recollection, which was:

> A. *Judge, I don't recollect whether I did or didn't* [threaten him with reindictment]. But *my best recollection is that I didn't.* I told his attorney I should have indicted him as an habitual. THE COURT: Is that your best recollection? That that is as far as it went along that line?
> A. Yes, sir, that is my best recollection.

(10th Cir. 1967). Weighing the alternatives, the accused may make a decision to take what he conceives to be the lesser of two evils, and the law may deem it voluntary, though it comes about at least in part through the coercion implicit in the existence of the more undesirable alternative. But in this case we know that appellant elected *not* to plead guilty, after having earlier agreed to do so. I am impelled to the conclusion that if a threat of reindictment was made it was with the intent and for the purpose of forcing appellant to plead guilty as agreed, which is precisely what he had said he was not willing to do. If the possibility of reindictment was in the picture it was, of course, a factor to be communicated by defense counsel to the accused as a part of the range of possible consequences, but I cannot close my eyes to the fact that, if existent, it found its origin in appellant's unwillingness to carry out his plea bargain and was asserted as a device to force him to plead guilty. Under such circumstances the imposition of possible reindictment as an alternative would be duress, and a plea entered from surrender to it would not be the voluntary choice of a free will which the law contemplates.[3]

Since the district court applied an incorrect legal standard as a ground of its decision, I would reverse and remand for consideration of the evidence under a proper standard. On remand additional evidence should be received on the issue of voluntariness of the plea. I think the trial court was plainly erroneous and its credibility determination patently wrong. But in any event if the case is remanded for the error of law we have power under 28 U.S.C.A. § 2106 to require such further proceedings to be had as may be just under the circumstances. In reaching my conclusion I need not stand on the testimony of petitioner and his father. I consider the guarded testimony of the district attorney, the fact that indictment of appellant as an habitual criminal *was* discussed, and the thin line between whether the discussion was in terms of "would have him indicted" or "should have had him indicted". I consider the unequivocal testimony of Caraway, in a context in which he was acknowledging that he viewed his own actions as not correct. This was something less than the usual credibility choice between two sharply conflicting versions. The district attorney tried in vain to convey to the trial judge that he really did not know. And when pressed by the court he sought to get the court to ask Caraway what took place. I consider also the grounds on which the habeas judge rejected Caraway's testimony.[4]

The evidence which could have dissipated any doubts about whether the

3. The situation is analogous to that in which a trial court, after a jury conviction, sentenced the defendant to the maximum because he insisted that he was innocent and would not accede to the court's demand to "make a clean breast" of the crime. Thomas v. United States, 368 F. 2d 941 (5th Cir. 1966). *See also* United States v. Wiley, 267 F.2d 453 (7th Cir. 1959) (refusal to consider probation for defendant who pleaded not guilty). In Heideman v. United States, 281 F.2d 805 (8th Cir. 1960) the petition alleged that for a relatively minor offense the prosecutor had said he would seek the most extreme penalty possible, totaling sixty years, divided into consecutive terms, which would amount to life imprisonment for the defendant, and said his recommendation on sentence would prevail, and then on the eve of trial offered a five year sentence for a plea of guilty. The court held the allegations were sufficient to require a hearing on the voluntariness of the plea.

4. The transcript reveals that one of the reasons was that Caraway was "pretty good at starting everything," had been from the law practice to the insurance business to the mortgage business and back to the law practice. This is no test of credibility. Another reason was Caraway's failure, when the guilty plea was taken, to advise the trial judge of the alleged threat. This proves little, because Caraway makes perfectly clear that he then thought it was in petitioner's best interest to carry out the plea bargain, but since has come to recognize that he erred in not objecting to the threat and not standing up more strongly for what petitioner himself wanted to do.

threat was made has not been heard—testimony from the senior defense attorney and long distance telephone records. Caraway testified that after the threat of reindictment was made he called the senior defense attorney in Dallas by long distance telephone and told him of the threat and asked him whether it could be carried out. As Caraway told it, the two of them discussed appellant's criminal record, the senior attorney examined notebooks in which he kept notes on criminal law, then gave him (Caraway) citations of cases, and advised him that appellant could be reindicted, saying "Yes, they can, they are not making idle talk, they can do what they say." It is almost inconceivable that such a call, if made, would have been made, and such a conversation ensue, if it did ensue, unless the alleged threat had been made.